**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

LEONOR CANTU,

                Plaintiff,

    vs.

_____

JO ANNE BARNART,
Commissioner of Social Security,

                Defendant.
_____/

CASE NO. CV-F-04-6127 LJO

**MEMORANDUM DECISION AND ORDER
ON PLAINTIFF'S APPEAL FROM
ADMINISTRATIVE DECISION** (Doc. 12)

      Plaintiff Leonor Cantu ("claimant") seeks judicial review of an administrative decision denying her claim for Disability Insurance Benefits and Supplemental Security benefits under the Social Security Act, Titles II and XVI ("Act"). Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties consented to proceed before a United States Magistrate Judge, and by a December 23, 2004 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all further proceedings. Pending before the Court is claimant's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner").

      Claimant filed her complaint on August 18, 2004 and her opening brief on April 18, 2005. The Commissioner filed her opposition to the appeal on June 23, 2005. Claimant did not file a reply brief.

/////

/////

1

1

## BACKGROUND

2

### Administrative Proceedings

3    Claimant filed an application for disability insurance benefits and supplemental security income

4    under the Social Security Act on August 28, 2002, alleging a disability onset of June 1999 due to severe

5    back pain from a car accident and arthritis in the left hand and wrist.  (Administrative Record ("AR")

6    55-57, 251-253.)  The application was denied initially and upon reconsideration.  (AR 31-39, 256-265.)

7    Claimant's application was further denied by an Administrative Law Judge ("ALJ") in a decision issued

8    on November 12, 2003. (AR 18-28.)  The Appeals Council denied review.  (AR 5-8.)  Claimant filed

9    this action for judicial review pursuant to 42 U.S.C. § 405(g).

10

### Claimant's Background and Work Experience

11    Claimant was born on May 27, 1951.  (AR 275.)  She has a seventh grade education.  (AR 280.)

12    She is able to read and write.  (AR 280.)

13

### Medical History

14    The pertinent medical history is summarized as follows.

15    On August 16, 2000, claimant reported back pain.  (AR 224.)  A diagnostic imaging report of

16    her lumbar spine showed a normal lumbar spine.  The imaging report of her left hip showed left side

17    sacroiliitis and calcified aorta.  (AR 225.)  Claimant was seen for physical therapy from August 30, 2000

18    October 19, 2000 to   (AR 215-218, 220-223.)

19    In a follow up exam for her back and wrist pain, on July 25, 2002, claimant was advised to

20    continue her medication, continue physical therapy.  (AR 232.)  Claimant was seen for physical therapy

21    from September 19, 2002 to November 5, 2002.  (AR 195-204.)

22    In August 27, 2002, claimant reported lower back pain which as become chronic.  (AR

23    180.)  A diagnostic imaging report on September 12, 2002 for claimant's left wrist showed a normal

24    wrist.  (AR 206.)   X-ray on June 6, 2003 showed osteoarthritis and biateral sacroiliitis.  (AR 247.)

25    On February 10, 2003, claimant was diagnosed with extreme myofascial pain disorder by Carla

26    Bratcher, MD., and was counseled to counter her extreme denial on need to exercise.  (AR 242.)  The

27    doctor recommended claimant use warm pool exercise.  (AR 242.)  A diagnostic imaging report of

28    claimant's lumbar spine was performed on February 24, 2003 due to back pain and sacroiliitis.  The

2

impression from the exam was "normal." (AR 239.)  In a follow up examination on March 3, 2003, claimant was diagnosed with myofascial tension disorder.  She could not be examined because claimant was "so uncomfortable." (AR 238.)  Dr. Bratcher recommended that claimant "must acclimatize to warm pool or cannot help patient." (AR 238.)  A diagnostic imaging report on March 10, 2003 gave the impression of left sided sacroiliitis.  (AR 237.)  On April 3, 2003, claimant reported that she will not undertake warm pool exercise due to fear of the water.  (AR 236.)  Dr. Bratcher noted that plaintiff would not accept the rationale of myofascial pain syndrom overlying the sacroiliitis.  (AR 236.)  Claimant wanted more studies to be performed.  (AR 236.)  Dr. Bratcher said that she would refer claimant for an orthopedic evaluation but that if additions studies simply confirmed her diagnosis, Dr. Bratcher wanted the orthopaedist to reinforce the diagnosis and treatment - warm pool exercise, at home stretching, antidepressants and muscle relaxants.  (AR 236.)

A state agency physician completed the Physical Residual Functional capacity assessment form in November 2002.  (AR 162-169.)  The physician found claimant could occasionally lift/carry a maximum of 20 pounds and frequently lift/carry 15 pounds.  Claimant was able to stand/walk six hours in a eight hour day with frequent breaks and sit six hours in a eight hour day.  She was restrict to "rare" pushing and pulling with her left upper extremity.  (AR 163.)  She was found to be able to occasionally stoop, climb, balance, kneel, crouch and crawl, and occasionally handle and finger with the left upper extremity.  (AR 164-165.)  The state agency physician determined that claimant should avoid all exposure to hazards.  (AR 166.)

Another state agency physician completed the Physical Residual Functional Capacity Assessment form in January 2003.  (AR 170-177.)   The physician found that claimant was able to occasionally lift/carry 20 pounds, and frequently lift/carry 15 pounds, stand/walk about 6 hours and sit about 6 hours.  Claimant was found to be limited in her ability to push/pull with her left upper extremity and was precluded from climbing ladders/ropes/scaffolds and was able to occasionally balance, stoop, kneel, crouch and crawl.  (AR 171-172.)

On October 19, 2002, claimant was seen for a comprehensive orthopedic evaluation by Navdeep Dhaliwal, M.D.  (AR 186-190.)  Claimant complained of low back pain, bilateral knee and hand pain.  (AR 186.)  Dr. Dhaliwal reviewed an x-ray of her lumbar spine which showed left sided sacroiliitis.

Claimant reported that her depression is under control with medication. (AR 187.) Claimant was able to walk into the room without difficulty, but had some difficulty getting onto the examination table. (AR 187.) Dr. Dhaliwal diagnosed claimant with low back pain, possibly facet arthropathy or sacroiliac joint arthritis, knee pain, possible degenerative arthritis, and hand pain, possible arthritis of hand joint /gouty arthritis. (AR 189.) He assessed claimant with no radicular symptoms and no evidence of radiculopathy or myopathy. She had decreased extension and lateral flexion and pain mainly on extension. (AR 189.) Dr. Dhaliwal did not find much evidence of joint arthritis in her knees, but she had significant tenderness in her left wrist joint.

Dr. Dhaliwal functionally assessed claimant with ability to stand and walk 6 hours in an eight hour period with frequent breaks, because walking will worsen her pain. She could sit unrestricted in an 8 hour period. (AR 189.) Claimant could lift 15 pounds frequently and 25 pounds occasionally. (AR 190.) Dr. Dhaliwal restricted frequent postural limitations on bending, stooping and crouching, and they could be performed occasionally. She was restricted on reaching, handling, feeling, grasping and fingering. She was to do no repetitive bending, crawling or kneeling. (AR 190.)

In 2003, Dr. Bratcher submitted a 2 page questionnaire in which Dr. Bratcher found that claimant could not perform even sedentary work due to sacroileitis [sic]. (AR 249.) The objective findings which supported the impairment was pattern of pain, neurologic exam, x-ray and gait disturbance. Dr. Bratcher opponent that the claimant could sit 30 minutes, stand and/or walk 15 minutes without rest, and sit for 3 hours and stand and/or walk 1 hour in an eight hour workday. (AR 249.) Dr. Bratcher opined claimant had been disabled since September 12, 2002.

**Hearing Testimony**

Claimant testified she last worked in August 2002 in childcare, taking care of her grandchildren. (AR 277.) She took care of the children for about 2 years. (AR 291.) She stopped working in 2002 because of her hands and her back. She testified she constantly has back pain. (AR 281.) She has hand pain when she lifts. (AR 281.) She also has hand problems when she pushes or pulls or holds objects. (AR 281.) She also has pain in her left knee. (AR 282.) It hurts when she bends, lifts her leg, walking on steps or walks too long. (AR 285.) She can walk about half a block and it starts hurting and can stand for 20 minutes. (AR 285.) She can sit about 10 minutes before she has to shift position or get up.

1   (AR 286.)   She takes medicine for her pain and its sometimes helps.  (AR 287.)  She uses a cane to

2   balance herself and her doctor prescribed it.  (AR 287.)  She had been using the case for about a month.

3   (AR 295.)  She has to lie down 30 minutes, 3 times a day for pain in her back.  (AR 289.)  She is able

4   to get household chores done by resting in between.  (AR 289.)  She goes to church on Sundays.

5          Vocational Expert ("VE"), Mr. Dettmer, testified.  The ALJ gave the VE a hypothetical where

6   claimant can stand six hours out of eight, walk six hours out of eight, with breaks, unrestricted sitting,

7   limitations against frequent bending, stooping and crouching, manipulative limitation on reaching,

8   handling, feeling and grasping with the left-non-dominate hand.  (AR 296-297.)  The VE testified the

9   claimant could not preform her past relevant work, but could do light, unskilled work of cashier with

10  160,000 position in California.  (AR 297-298.)  The VE testified the number of jobs would be eroded

11  by half due to the manipulative restrictions on the non dominate hand.  (AR 298.)  The VE testified that

12  another position would be delivery courier of which there are 16,000 positions.  (AR 298.)  In the second

13  hypothetical, the claimant could lift 25 pounds occasionally, and 15 pounds frequently, stand and/or

14  walk six hours in eight hour work day, with frequent break, sit six hours, limited to occasional handling

15  and fingering and avoid all exposure to hazards.  (AR 298-299.)  The VE testified that claimant could

16  not do her past relevant work but could perform the work of a cashier, with erosion of 50 percent and

17  office helper.  (AR 299.)  In the third hypothetical, claimant could lift 20 pounds occasionally, 15 pounds

18  frequently, stand and/or walk six hours out of eight, with limited pushing, pulling, fingering and

19  handling in the upper left extremity.  (AR 300.)  The VE testified the jobs claimant could perform are

20  the same as in the first hypothetical.  (AR 300.)

21                                          **ALJ Findings**

22          In his November 12, 2003 decision, the ALJ characterized the "primary issue" before him as

23  whether claimant was disabled.  (AR 18.)  In determining claimant was not disabled and not eligible for

24  disability benefits, the ALJ made the following findings (AR 27-28):

25          1.      The claimant meets the nondisability requirements for a period of disability and

26                  Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and

27                  is insured for benefits through the date of this decision.

28          2.      The claimant has not engaged in substantial gainful activity since the alleged onset of

disability.

3.     The claimant has an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §404.1520(b) and 416.920(b).

4.     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The ALJ finds that the claimant's allegations and those of her roommate regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.     The ALJ carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§404.1527 and 416.927).

7.     The claimant has the following residual functional capacity: occasional lifting, sitting 6 of 8 hours per day, standing 6 of 8 hours per day, manipulative limitations of left upper extremity for handling and fingering, no climbing, balancing, stooping, kneeling, crouching or crawling and no exposure to environmental hazards such as machinery and heights.

8.     The claimant is unable to perform any of her past relevant work.  200 CFR §§404.1565 and 416.965.

9.     The claimant is an "individual closely approaching advanced age."  20 CFR §§404.1563 and 416.963.

10.    The claimant has "a limited education."  20 CFR §§404.1564 and 416.964.

11.    The claimant has no transferable skills from any past relevant work and /or transferability of skills is not an issue in this case.  20 CFR §§404.1568 and 416.968.

12.    The claimant has the residual functional capacity to perform a significant range of light work.  20 CFR §416.967.

13.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a cashier (50,000 region-wide) and a courier (5,000 region wide).  All of these jobs have a specific vocational preparation of

1    two and require light exertion.

2    14.    The claimant was not under a "disability," as defined in the Social Security Act, at any

3          time through the date of this decision.  20 CFR §§404.1520 (f) and 416.920(f).

4                                    **DISCUSSION**

5                                 **Standard of Review**

6          Congress has provided a limited scope of judicial review of a Commissioner's decision.  *See* 42

7    U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the

8    determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*,

9    760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510

10   (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating

11   physician's findings).  Substantial evidence is "more than a mere scintilla" (*Richardson v. Perales*, 402

12   U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119,

13   n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as

14   adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.

15         The record as a whole must be considered, weighing both the evidence that supports and detracts

16   from the Commissioner's conclusion.  *Jones,* 760 F.2d at 995.  If there is substantial evidence to support

17   the administrative findings, or if there is conflicting evidence that will support a finding of either

18   disability or nondisability, the finding of the Commissioner is conclusive.  *Sprague v. Bowen*, 812 F.2d

19   1226, 1229-1230 (9th Cir. 1987).

20         Thus, this Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g) to

21   determine whether it is:  (1) based on proper legal standards; and (2) supported by substantial evidence

22   in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).

23         Claimant contends the ALJ erred in that the ALJ:  (1) wrongly rejected the treating doctor

24   opinion of Dr. Bratcher, (2) failed to develop the mental health impairment record, (3) failed to properly

25   review the testimony, and (4) the vocational evidence is insufficient to support the ALJ's decision.

26                **The ALJ's Finding of Residual Functional Capacity**

27         To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial

28   gainful activity due to a medically determinable physical or mental impairment which has lasted or can

                                          7

1   be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382a(3)(A).

2         The Commissioner has final responsibility to determine a claimant's residual functional capacity.

3   20 C.F.R. § 404.1546.  "Residual functional capacity" is the phrase used by the Commissioner to denote

4   a claimant's ability to perform work-related tasks despite his physical or mental impairments.  20 C.F.R.

5   §§ 404.1545(a) and 416.945(a).  Categories of residual functional capacity include sedentary, light,

6   medium, heavy and very heavy work.  20 C.F.R. §§ 404.1567 and 416.967.  In this case, the ALJ found

7   that plaintiff had the residual functional capacity to perform light work, with restrictions.  Under the

8   applicable regulations, "light work" is defined as follows:

9                Light work involves lifting no more than 20 pounds at a time with frequent lifting
              or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
10             may be very little, a job is in this category when it requires a good deal of
              walking or standing, or when it involves sitting most of the time with some
11             pushing and pulling of arm or leg controls.  To be considered capable of
              performing a full or wide range of light work, you must have the ability to do
12             substantially all of these activities.

13  20 C.F.R. §§ 404.1567(b) and 416.967(b).  Social Security Ruling 83-10 further defines this term by

14  stating that " . . . the full range of light work requires standing or walking, off and on, for a total of

15  approximately 6 hours of an 8-hour workday."  Ruling 83-10 further explains that "[s]itting may occur

16  intermittently during the remaining time."

17        Here, the ALJ found that claimant has the residual functional capacity to perform occasional

18  lifting, sitting 6 of 8 hours per day, standing 6 of 8 hours per day, manipulative limitations of left upper

19  extremity for handling and fingering, no climbing, balancing, stooping, kneeling, crouching or crawling

20  and no exposure to environmental hazards such as machinery and heights.

21        Claimant argues the ALJ erred in finding any residual functional capacity because her treating

22  physician Dr. Bratcher opined claimant cannot perform any work.

23        Generally, more weight should be given to the opinion of a treating source than to the opinion

24  of doctors who do not treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The Ninth

25  Circuit has held that a treating physician's opinion is generally to be afforded great weight in disability

26  cases because he or she ". . . is employed to cure and has a greater opportunity to know and observe the

27  patient as an individual."  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987); *see also* 20 C.F.R.

28  §§ 404.1527(d) and 416.927(d).  However, a treating physician's opinion is not conclusive as to a

8

claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even where it is not contradicted.  20 C.F.R. § 404.1527(e); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (inconsistencies and ambiguities in treating physician's opinion concerning level of disability sustained by social security claimant, were specific and legitimate reasons for not accepting physician's opinion.)

The Ninth Circuit Court of Appeals has established requirements when an ALJ disregards the treating physician's opinion:

> "The ALJ may disregard the treating physician's opinion, but only by setting forth "specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence."  This burden can be met by providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof. *Id.*  Furthermore, the ALJ's reasons for rejecting the doctor's opinion must be "clear and convincing."

*Rodriquez,* 876 F.2d at 762 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary will concur, absent review of medical findings and other evidence. 20 C.F.R. §416.928. Claimant bears the burden of proving that he is disabled by presentation of "complete and detailed objective medical reports of h[is] condition from [a] licensed medical professional." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. 404.1512(a)-(b), 404.1513(d)).

The ALJ gave a detailed summary of the facts and conflicting clinical evidence.  (AR 16-22.) The ALJ reviewed all of the objective medical evidence in the record, including the records from Golden Valley Health Center, and Health Services Agency, and specifically summarized the treatment records by Dr. Bratcher and others, and identified the conflicting clinical evidence.[1] (AR 23-24.)

The ALJ did not accept the opinion of Dr. Bratcher who opined that claimant cannot perform even sedentary work.  The ALJ noted that "[t]here is a gap in treatment between November 2000 and August 2002."  The ALJ recounted in detail the records from Dr. Bratcher such as:

> "The claimant saw her treating physician, Dr. Carla Bracher [sic], on

---

[1] Claimant argues that the ALJ failed to consider the physical therapy records.  To the contrary, the ALJ reviewed and cited the physical therapy records.  (AR 22-23.)

9

September 12, 2002 and complained of back and wrist pain.  Dr. Bracher noted depressed effect with claimant complaining of wrist pain secondary to a fall she took approximately one month prior.  Dr. Bracher diagnosed chronic pain syndrome with insomnia.  It appears that physical therapy was prescribed for the wrist pain . . .The claimant saw her treating physician again on October 14, 2002 and complained of back and wrist pain. . . .An orthopedic referral was made for the wrist pain.  The claimant saw her treating physician on October 17, 2002 for medication refills."  (AR 22-23) (evidence citations omitted.)

The ALJ rejected the diagnosis because it "appear[ed] to be based only on the claimant's subjective complaints with no objective medical findings.  In addition, no limitations were imposed as a result of this diagnosis."  (AR 23.)

The next diagnosis by Dr. Bratcher was similarly rejected by the ALJ as unsupported by objective findings.  (AR 24.)  The ALJ noted claimant's visit with Dr. Bratcher:

"The claimant was seen by her treating physician, Dr. Bracher [sic], on February 10, 2003 for low back pain.  The medical record notes an extremely tender sacrum and that the claimant would not permit an exam.  The treating physician diagnosed extreme myofascial pain disorder and noted that the claimant was counseled in an attempt to counter her extreme denial on the need to exercise.  Warm pool exercise was recommended."  (AR 24) (evidence citation omitted.)

The ALJ, however, rejected the opinion because it was not supported by examination and was based solely on claimant's subjective complaints:

"The undersigned assigns little weight to this diagnosis as it appears to be given in an attempt to explain the claimant's symptoms with no objective medical findings and no stated limitations."  (AR 24.)

The ALJ specifically addressed the final opinion of Dr. Bratcher that claimant could not perform even sedentary work:

"Subsequent to the hearing on August 13, 2002, the claimant submitted an undated questionnaire from Dr. Carla Bracher [sic] stating that the claimant is unable to perform full time work at any exertional level, including sedentary, due to sacroiliitis."  (AR 24.)

In analyzing the opinion, the ALJ recited the bases upon which Dr. Bratcher formed her opinion:

"Dr. Bracher lists pattern of pain, 'neurologic' [sic] examination, x-ray and gait disturbance as her objective findings."  (AR 24) ([sic] in original.)

The ALJ then stated specific reasons for rejecting each of the bases which formed Dr. Bratcher's opinion.  The ALJ said:

10

     1.      Dr. Bratcher relied heavily on the claimant's subjective complaints of pain in formulating her diagnosis. (AR 24.)

     2.      There is no "neurologic" [sic] examination in the medical records. (AR 24.)

     3.      The existing x-rays do not reveal an impairment consistent with the severity of the reported pain. (AR 24.)

     4.      The assessment is inconsistent with Dr. Bratcher's noted date March 3, 2003.

The ALJ stated clear and convincing reasons for rejecting the opinion of Dr. Bratcher. The Record does not contain a "neurologic" examination upon which Dr. Bratcher partially based her opinion. For instance, the treatment notes record subjective complaints (AR 236) and inability to examine, but no neurological examination. (AR 238, 242.)

The x-rays cited by the ALJ showed normal lumbar spine (AR 225) and left sided sacroiliities (AR 237), an impairment which the ALJ found severe but which did not meet the listings, and a normal wrist (AR 206). An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes v Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ also found Dr. Bratcher's opinion inconsistent with Dr. Bratcher's March 3, 2003 treatment note. Dr. Bratcher's treatment noted dated March 3, 2003, stated that claimant could not be examined because claimant was "so uncomfortable," and that Dr. Bratcher recommended that claimant "must acclimatize to warm pool or cannot help patient." (AR 238.)

The ALJ set forth specific and legitimate reasons to reject Dr. Bratcher's assessment in full and provided a comprehensive, detailed summary of the facts and conflicting clinical evidence. It is the ALJ's duty to resolve conflicting medical evidence. *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003) (Where, as here, the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict.) The ALJ correctly noted the inconsistency with Dr. Bratcher's assessments with that of the records prepared contemporaneously with claimant's treatment. On balance, the ALJ properly found claimant's inconsistencies as to her abilities, credibility questions and objective medical evidence outweighed Dr. Bratcher's assessments.

The ALJ relied upon the consultative examination by Dr. Dhaliwal's in assessing claimant's

residual functional capacity, which was supported by two reviewing state agency physicians. (AR 162-169, 171-172.)  Dr. Dhaliwal found claimant was capable of performing a range of light work, with limitations. (AR 186-190.)  Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding examining physician's opinion that claimant could lift and carry 20 to 50 pounds constituted "substantial evidence" in support of ALJ's finding that claimant could perform medium work, where examining physician's opinion was based on results of "his own independent examination"); *Allen v. Heckler,* 749 F.2d 577, 579 (9th Cir.1984) (holding where examining physician offered opinion, based on "his own neurological examination," that claimant could perform sedentary work, while treating physician opined that claimant was totally disabled, ALJ's finding that claimant could perform sedentary work was supported by "substantial evidence").  The opinion of a reviewing physician and the ALJ's conducting an independent analysis of the medical evidence may constitute substantial evidence. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). Thus, there is substantial evidence in the record for the ALJ's finding that claimant could perform light work with restrictions. The ALJ did not err.

## **Mental Health Impairment**

Claimant argues that the ALJ did not develop claimant's mental health record.  She argues she was treated for over two years for depression, but the ALJ did not develop the Record.

Although the claimant bears the burden of proof where the evidence in the record is equivocal, the ALJ has a duty to assist in developing the record. *Armstrong v. Commissioner of Social Security*, 160 F.3d 587, 589-90 (9th Cir.1998); see also *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2084 (2000); 20 C.F.R. § 404.1512(a) (instructing claimant that ALJ will consider "only impairment(s) you say you have or about which we receive evidence"); *id.* §§ 404.1512(d)-(f) (detailing the ALJ's duties to develop a claimant's complete medical history before making a determination of non-disability; to obtain additional information if reports from claimant's medical sources contain ambiguities or are otherwise "inadequate for us to determine whether you are disabled;" and to order a consultative examination if unable to seek clarification from medical sources or if "the information we need is not readily available

from the records of your medical treatment source").  If the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Claimant does not identify what records or information is missing from the Record which the ALJ should have developed.  The evidence in the Record shows that claimant was prescribed anti-depressant medication by her general physician and the depression was stable on medication.  (AR 187, 219, 230.)  The claimant has the initial burden of proving the existence of a disability within the meaning of the Act.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  Claimant does not argue what additional records existed for the ALJ to develop.  The Court does not find error.

## ALJ's Review the Testimony

Claimant argues that the ALJ failed to review all criteria under Social Security Ruling (SSR") 96-7p before rejecting her subjective complaints of pain.

Claimant has not cited to any authorities, aside from SSR 96-7p, for the proposition that the ALJ must consider *all* of the 96-7p factors.  To the contrary, the Ninth Circuit has upheld ALJ's findings on less than an evaluation of all of the SSR 96-7p listed factors.  "In assessing the claimant's credibility, the ALJ may use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and any inconsistent statements in [his] testimony. The ALJ must give specific, convincing reasons for rejecting the claimant's subjective statements." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147, 1148 (9th Cir. 2001) (upholding adverse credibility finding where ALJ cited claimant's "lack of cooperation at the hearing, her presentation at the hearing, her tendency to exaggerate, her inconsistent statements, and her lack of cooperation during consultative examinations"); *Orteza v. Shalala*, 50 F.3d 748 (9th Cir.1995) (upholding adverse credibility finding where ALJ identified treating physician's statement as to lack of objective evidence, pointing to the scope of activities identified in claimant's initial application, no medication side effects or prescription medicine.); *Meanel v. Apfel*, 172 F.3d 1111 (9th Cir. 1999) (upholding adverse credibility finding on claimant's inconsistent testimony with that of treating physician's notes, minimal conservative treatment for alleged incapacitating pain).

13

1    To determine whether the claimant's testimony regarding the severity of his symptoms is

2  credible, the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as

3  the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

4  testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained

5  failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily

6  activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). An ALJ's finding that a claimant

7  generally lacked credibility is a permissible basis to reject excess pain testimony. *Light v. Social Sec.*

8  *Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). An ALJ "may disregard unsupported, self-serving

9  statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

10    The ALJ considered ordinary techniques of credibility.  The ALJ considered the large gap in the

11  medical treatment record in which there was an absence of treatment.  (AR 22-23.)  The need for

12  infrequent or conservative treatment may refute allegations of disabling pain or impairment.  *See Fair*

13  *v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989).  The ALJ noted the conservative nature of the

14  medications, although he acknowledged that she was taking a stronger medication, Neurontin, at the time

15  of hearing.  (AR 21, 24.)  The ALJ noted claimant refused the treatment prescribed by her physician,

16  warm water exercise and the need for exercise. *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995)

17  (Failure to follow prescribed treatment is a proper basis for rejecting allegations of disabling pain.); 20

18  CFR 404.1530 (requiring following treatment to be found disabled).  The ALJ noted claimant had taken

19  care of her grandchildren full time after the onset of her alleged disability.  (AR 20.)  The ALJ found

20  claimant's testimony as to her pain "unresponsive" and conflicting and the ALJ provided specific

21  examples of such testimony.  (AR 21; "At first she testified that her knee pain was 'not all the time,' then

22  'constant' and then 'with activity.'")

23    Thus, the ALJ made specific findings as to the lack of credibility as to the extent of claimant's

24  purported pain.  "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d at

25  604.  Accordingly, there is substantial evidence in the record to support the ALJ's rejection of claimant's

26  subjective complaints.

27    Claimant also argues that "[h]er testimony was ignored in the decision for the most part.  Much

28  of it was misstated."  (Opening brief, p.6:17.)

14

1    Claimant's brief fails to develop these points and the Court will not speculate on them. When

2    an ALJ has made specific findings to justify a decision to disbelieve subjective complaints and the

3    findings are supported by substantial evidence, a court may not second guess the decision. *Fair*, 885

4    F.2d at 604.

5    Next, claimant argues that the ALJ "played doctor" by reporting Naproxen and Neurontin are

6    medications which are inconsistent with the alleged pain.

7    An "ALJ must not substitute his own opinion for those of physicians." *Day v. Weinberger,* 522

8    F.2d 1154, 1156 (9th Cir.1975). At the same time, "When there is conflicting medical evidence, the ALJ

9    is required to resolve such conflicts." *Morgan v. Apfel,* 169 F.3d 595, 602 (9th Cir. 1999). The

10   characterization of the medications did not "substitute" the ALJ's opinion for that of the physician.

11   Indeed, the ALJ acknowledged that claimant was taking stronger medication, Neurontin. (AR 21.)

12                          **Hypothetical to the VE**

13   Claimant makes multiple arguments regarding the VE's testimony: (1) the ALJ erred because

14   the VE did not report that claimant could perform the job as a courier, (2) the VE erred in that the cashier

15   job requires more than occasional use of the upper extremities contrary to what claimant is capable of

16   performing, (3) the VE should have compared the DOT to the jobs the VE listed claimant as capable of

17   performing, and (4) the VE's testimony was vague and confusing.

18   **A.    VE Testimony on the Courier Job**

19   At Step Five, it is the Commissioner's burden to establish that jobs exist in the national economy

20   that the plaintiff can perform. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001); 20 C.F.R.

21   §404.1520(f). The Commissioner may meet this burden in two different ways: (1) the testimony of a

22   vocational expert ("VE"), or (2) by reference to the Medical-Vocational Guidelines at 20 CFR Part 404,

23   subpart P. *Osenbrock v. Apfel*, 240 F.3d at 1162.

24   Here, the ALJ employed a vocational expert to opine as to whether claimant could perform any

25   past relevant work and whether other available jobs exist in the national economy. Vocational experts

26   may discuss more specific jobs than the general category of jobs found in the DOT. *Moncada v. Chater*,

27   60 F.3d 521, 524 (9th Cir. 1995); *Distasio v. Shalala*, 47 F.3d 348, 350 (9th Cir. 1995) ("vocational

28   experts can testify whether particular applicants for disability benefits would be able to perform

15

1  subcategories of jobs within the DOT.").

2      The ALJ's first hypothetical elicited from the VE that claimant was capable of performing jobs
3  as a cashier and as a courier.  In the ALJ's second hypothetical, the ALJ imposed the restriction of
4  avoidance of hazards.  With this restriction, the VE eliminated the position of courier, due the hazard
5  of driving.  (AR 299.)  Claimant argues it was error for the ALJ to adopt the courier position as a job she
6  can perform because of the restriction of avoiding hazards.

7      The ALJ, however, did not restrict claimant from <u>all</u> hazards.  The ALJ found that claimant
8  would be limited to "no exposure to environmental hazards such as machinery and heights."  (AR 27,
9  Finding no. 7.)  Even assuming that the restriction includes hazards from driving, there is substantial
10  evidence of other jobs claimant can perform.  The VE testified that light cashier is available to claimant.
11   Thus, the ALJ identified another job in the economy that claimant could perform.  Therefore, even if
12  the ALJ erred by including the position of courier, it is harmless error.  *Booz v. Secretary of Health and*
13  *Human Resources*, 734 F.2d 1378, 1380 (9th Cir. 1984) (where an ALJ engaged in an unnecessary
14  exercise, any error that may have occurred as a result is harmless).

15      While not clear, claimant appears to also argue that there are an insufficient number of cashier
16  jobs.  Contrary to claimant's argument in her opening brief, the VE did not identify only 5,000 such
17  cashier jobs.  (Opening brief p.3:20.)  Rather, the VE identified some 160,000 such jobs which would
18  then be eroded by claimant's postural limitations and her manipulative limitations.  (AR 302.)

19      The Ninth Circuit has not clearly established the minimum number of jobs necessary to constitute
20  a "significant number."  *Barker v. Secretary of Health and Human Services*, 882 F.2d 1474, 1479 (9th
21  Cir. 1989).  The Eighth Circuit has held that 500 jobs are a significant number.  *Jenkins v. Bowen*, 861
22  F.2d 1083, 1087 (8th Cir. 1988).  This Court has found 600 jobs is a significant number.  *Salazar v.*
23  *Califano*, Unemp. Ins. Rep. (CCH, para. 15,-835) (E.D. Cal. 1978).  The ALJ identified 50,000 cashier
24  jobs, after erosion for claimant's limitations.  Certainly some 50,000 jobs is not an insignificant number.

25  **B.    VE and the DOT**

26      Claimant argues that the VE's testimony of the job of cashier should have been compared with
27  the Dictionary of Occupational Titles ("DOT").

28       The DOT is "the Secretary's primary source of reliable job information."  *See Terry v. Sullivan*,

16

903 F.2d 1273, 1276 (9th Cir.1990); *cf.*, 20 C.F.R. §404.1566(d)(1). One purpose of the DOT is to classify identified job titles by their exertional and skill requirements. *Terry*, 903 F.2d at 1276. The DOT, however, "is not the sole source of admissible information concerning jobs." *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.1994). Introduction of evidence of the characteristics of specific jobs available in the local area through the testimony of a vocational expert is appropriate, even though the job traits may vary from the way the job title is classified in the DOT. *Johnson v. Shalala*, 60 F.3d 1428 (9th Cir. 1995). Although the Commissioner may depart from the job descriptions listed in the DOT, such a departure is permissible only if "the record contains persuasive evidence to support the deviation." *Johnson v. Shalala*, 60 F.3d at 1435.

The VE testified that in his experience, cashier positions may be performed with minimal left hand manipulation. The VE testified such jobs exist in small mini-marts, self-serve gas stations, and movie theaters. (AR 303.) There is no evidence that contradicts the VE's experience in this regard. *Johnson v. Shalala*, 60 F.3d at 1435-36 (Rote reliance on the Dictionary of Occupational Titles, even by the vocational expert herself, is inappropriate where the vocational expert's practical experience with the job market reveals a contrary classification.)

**C.      Incomplete Record/Inaudible in Transcript**

Claimant points out that the transcript of the administrative hearing contains "inaudibles" during the VE's testimony. Claimant argues that the record is incomplete because there is no way to know what was omitted in the transcription.

The Administrative Record transcript was prepared from an electronic recording, and sprinkled in it are omissions identified by the transcriber's insertion of the word "inaudible." Whether the transcript is inadequate depends upon the materiality of the omissions. The plaintiff shoulders the burden of showing that some material evidence was not reported or was so incompletely reported that its effect is obscured. *McGlone v. Heckler*, 791 F.2d 1119, 1120 (4th Cir. 1986).

Here, claimant fails to set forth any content of what was omitted in the transcript. Claimant speculates as to whether one word or an entire sequence was omitted, but offers no evidence of what was potentially omitted. On the other hand, the transcript discloses sufficient evidence for the Court's fair and thorough review of the Commissioner's decision.

**D.      Clarity of the VE's testimony**

Claimant argues that the testimony of the VE is vague, equivocal and confused.

Initially, the ALJ struggled with the limitations which should be included in the first hypothetical based on ambiguous language of residual functional capacity stated by the consultative examiner. (AR 296-297.) The struggle was based on the wording of the functional limitations assessed by the consultative examiner. (AR 296: ". . .The only way I can read that logically is she can stand an eight-hour period, doesn't need frequent breaks for standing but does need frequent breaks if walking is involved. Okay?"); *See Macri v. Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996) (The ALJ is entitled to draw inferences logically flowing from the evidence in the proceedings before him.) When the ALJ asked the VE is he had any "[q]uestions about those limitations," the VE responded that "I guess I'm okay with that." (AR 297.) The Court infers that the VE stated he understood the limitations, because the VE testified without any question as to the limitations and even clarified for the ALJ that the limitations would be to the left, non-dominate side, a point not clarified by the ALJ. (AR 297.) The Court does not find the VE's testimony confused or "rambling."

Claimant argues that the VE did not understand the term "occasional", wrongly thinking it meant "not constant." (Opening brief p.4:16-17.) The VE's testimony on this point is:

> ALJ:   Well, it says there are manipulative limitations.  No frequent, occasional, the best way I can  - -
>
> VE:    Okay, Occasional reaching, handling, etcetera, so not constant.
>
> ALJ:   Frequent. More frequent that [sic] occasional.
>
> VE:    Okay, Well, we're talking about the light cashier.  (AR 297-298.)

The Court does not infer error in this exchange.  Vocational evidence is provided by a person who, through training and experience in vocational counseling or placement, has an up-to-date knowledge of job requirements, occupational characteristics, and working conditions, as well as a familiarity with the personal attributes and skills necessary to function in various jobs. *Wilson v. Califano*, 617 F.2d 1050 (4th Cir. 1980).

/////

/////

1    Claimant argues that the VE did not identify the corresponding DOT numbers for the jobs he

2   identified claimant could perform.  Identifying the DOT job number, however, is not required and

3   claimant fails to cite any authority that the VE must do so.

4                                          **CONCLUSION**

5   _____The Court finds no error in the ALJ's analysis.  As such, the ALJ's decision is supported by

6   substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this

7   Court DENIES claimant's appeal from the administrative decision of the Commissioner of Social

8   Security.  The clerk of this Court is DIRECTED to enter judgment as a matter law in favor of defendant

9   Jo Anne B. Barnhart, Commissioner of Social Security and against claimant Leonor Cantu.

10

11  IT IS SO ORDERED.

12  **Dated:    July 22, 2005**                        **/s/ Lawrence J. O'Neill**
    b9ed48                                    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                             19